## LUDLOW, Ad., etc., vs. FLOURNOY et al.

1. WILLS: *Probate of, on insufficient evidence.*

The granting of probate of a will on insufficient evidence, is only error, which may be corrected by an issue of *devisavit vel non*, on appeal in the circuit court; and the proceedings and orders of the probate court, can not be collaterally attacked; nor even directly in chancery, except for fraud, or perhaps on some other peculiar ground of chancery jurisdiction.

2. SAME: *Executor, authority of, relates to grant of administration.*

The authority of an executor relates to the grant of administration to him by the probate court, and not to the mechanical issuance of the letters testamentary, as evidence of his authority.

3. EXECUTOR: *To whom liable for waste.*

For waste, or loss, a former executor or administrator is liable to heirs, legatees and creditors, but not to an administrator *de bonis non.*

4. SAME: *His powers.—selling land. His receipt to purchaser, sufficient discharge.*

An executor derives his powers from the will. If it authorizes him to sell lands, he may do so without the order of any court. And, in the absence of fraud, his receipt to the purchaser for the purchase money, is a sufficient discharge.

5. FRAUD: *Purchaser concerting with executor.*

One who purchases land at less than its value, by concerting with the executor, may be held to pay its full value, and the land be held to a trust for the purpose.

6. SAME: *Acquiescence—Limitation.*

Acquiescence for a considerable time is often an element against relief; and will prevent creditors from questioning sales by executors.

7. ADMISSIONS: *Trustee's, not admissible against cestui que trust.*

The statements or admissions of a trustee, of a past transaction, can not be admitted against the interest of his *cestui que trust.*

APPEAL from *Desha* Circuit Court in Chancery.

Hon. J. A. WILLIAMS, Circuit Judge.

*Pindall,* for appellant.

*Weatherford, Garland, Clayton, contra.*

EAKIN, J.   In the year 1861, Thompson B. Flournoy, a citizen of Desha county, died, leaving a large estate, consisting of lands, slaves, personal property and choses in action.

He left a will, with several codicils.   It begins as follows: "I desire all my just debts to be paid; and for the payment of any I may contract during my life, I authorize my executors hereinafter named, to sell and convey, or pledge, or mortgage any part of my estate, first commencing with my wild lands." He made other dispositions of his whole estate, in the interests of his wife and children, which it is not important to notice specially, save for this, that in order to carry out the same, he provides that: "It shall be in the discretion of my executors whether the division shall take place in kind, or the property shall be sold and the proceeds divided."

He made his wife trustee for his daughters, as well as executrix (with others), and empowered her, as such trustee, after his daughters should become entitled to the estate, " to sell or exchange any part of said estate ; and with the proceeds of said sale, or with the income of said estate, buy other property and hold the same for said daughters."

In a subsequent clause he says : "I wish all my wild lands to be sold whenever my executors shall deem it best for the interest of my wife and children ; and I hereby invest them with the power to sell and convey the same." And then goes on to direct the use of the proceeds.  Executors were named, his wife among them, and they were relieved from the necessity of giving security for the discharge of their duties.   This will bore date the eighteenth of January, 1858, and was duly executed in the presence of two witnesses.   Subsequent additions were made at

different times, signed by the testator alone, none of them touching the power of sale, until the twenty-ninth of May, 1861, when he added a formal codicil, executed in due form of law, with the same two witnesses as in the principal will.

This codicil the testator meant to be considered as a modification, and a part of his whole will, taken in connection with what he had done before, which, indeed, is implied by the use of the term "codicil." In it he revoked the nomination of all executors except his wife, who had been named in the original will as one of three; and clothed her with all the powers which had been conferred on all. She was further, by said codicil, advised and empowered "to sell this my home tract whenever in her judgment the proper time arrives." A residence in Kentucky, owned by testator, was also placed at the discretion of the executrix.

On the eighteenth of October, 1861, the affidavit of two witnesses was taken before the clerk, proving the handwriting of the testator in his signature to the will, and of one of the subscribing witnesses. The handwriting of the other subscribing witness was also proved by one of the affiants.

On the sixteenth of April, 1862, the paper purporting to be the last will and testament of T. B. Flournoy, was presented to the probate court of Desha county, then in session, upon the evidence theretofore taken before the clerk of the court, which was held satisfactory. Whereupon the will was admitted to probate, and established as such; and it was ordered, "that letters testamentary issue thereon to Elizabeth J. Flournoy, executrix, named in said will, and that no bond be required from her before issuing said letters, the same being waived by said will."

This order is to be understood of the original paper and the superadded codicils, making altogether one will. The proof of the last being attached to the same paper, and referring to the others, would have been proof of the whole will. See *Barnes v. Crow, and notes, 4 Bro. C. C., p. 2.*

After the 'war of secession had closed and peace had been restored, at the December term, 1865, the probate court, on the petition of said executrix, reciting the fact that the will had been duly probated in 1862, and that petitioner had been authorized to take upon herself the burden of such trust, ordered again that letters testamentary, with the will annexed, be issued to the petitioner "upon her filing the affidavit required by the statute, and that no bond be required of her."

During the year 1866, as appears from the exhibits, a large amount of debts were probated and allowed against the estate, amongst them, a claim in favor of the estate of James Brown, for $2,158.

At the March term, 1867, upon petition and motion of creditors, a citation was issued against said executrix, to show cause why her letters should not be revoked because of her having become a non-resident. The citation could not be served, and the court, upon proof, heard, at the September term, revoked her letters and ordered her to file her accounts for final settlement. It was further ordered that the sheriff, as public administrator, should take out letters.

Shortly afterwards, in December, 1867, at a subsequent term, she appeared in court, made explanations, showed her continued residence, and, on her motion, her letters were renewed. At the same term, on her petition, the

court granted her dower in said estate, and appointed commissioners to lay it off; which was afterwards done.

At the March term, 1868, Mrs. Flournoy filed an inventory of the estate, with her report and settlement, which was continued and due notice ordered. No exceptions were taken, and all were confirmed at the next term, on the second of June, 1868.

The report shows that she entered upon the duties of the administration in 1861, under the belief that letters testamentary had been issued. She did not then doubt her ability to pay off all the debts, which were in the aggregate less than one fifth of the value of the whole estate. That during the war it was almost impossible to obtain orders of the court, or get officers to administer oaths. She, believing herself authorized by the will, had paid debts which she was satisfied were correct, without waiting for probate, and had educated the children, who were legatees. That she had paid levee subscriptions for the benefit of the estate, appropriating rents and proceeds of personal property to the purpose, and that she had been compelled to sell the home place, for the sum of $4,000, for the purposes of the estate.

She gives an inventory of the personal property, which consisted, for the most part, in slaves and cotton, the former of which had been emancipated, and the cotton, much of it, destroyed during the war. In short, let it suffice to say of this settlement, that it exhibited a management on her part, regardless of the law; but such as many planters during that unhappy period did not surpass in acting for themselves. She brought the estate in debt to her nearly $20,000. In 1869, the will was again probated with additional proof, and the letters theretofore issued confirmed by the court.

Afterwards, in January, 1870, she repurchased from the vendee the land she had sold for $4,000, and took a reconveyance to herself in her character of executrix—repaying to the vendee the original purchase money and $1,000 more for taxes, improvements, etc., and on account of greatly appreciated value.

On the fifteenth of February, 1870, said executrix, acting under her powers in the will, sold and conveyed six hundred acres of the lands, mostly improved, to Clifton R. Sheppard and Charles B. Blackburn, for the expressed consideration of $5,100 paid, and the further consideration of two bills of exchange for $2,550 each.

On the twenty-sixth of March, 1870, she, in the same character, sold and conveyed another portion to Luke P. Blackburn, in trust for his wife, for the express consideration of $8,273. This tract contained 467.05 acres.

On the fourteenth of February, 1870, she also sold and conveyed to Henry B. Blackburn another portion of land for the expressed consideration of $8,000, containing about 600 acres.

On the twenty-sixth of March, 1870, she also sold and conveyed to Henry B. Blackburn another tract, containing about 508 acres, for the expressed consideration of $6,000.

Before either of these, she had, on the twenty-first day of December, 1869, sold and conveyed to Joseph Bryan, for $707, another tract containing about 707 acres.

During the same year she filed a second settlement, in which she charges herself with the proceeds of all these tracts save the last, and asks credit for the $5,000 paid to repurchase the tract originally sold for $4,000, as above stated.

The complainant, Marvin H. Ludlow, appeared in court as the administrator of James Brown, one of the creditors

whose claims had been allowed in 1866, and excepted to this settlement. He objected: First—because of the claim as a credit of balance shown to be due her on first settlement, saying it was for debts which she had assumed, and on which she should only be allowed a pro rata, if anything; second—to the attorney's fees; third—to a dower in lands claimed as money; and fourth—because there was no account of lands in Tennessee. The second and third grounds seem to have been allowed, for the items were struck out, whatever they were, and a balance against the executrix shown of more than three thousand dollars. No exceptions were taken to the sale of the lands or the amounts received. The report, as corrected, was confirmed by the court, save as to the sale of the lands, which the court did not attempt to confirm, apparently because the same was not made under order of the court, but did confirm her report of the purchase money and her disposition of it, and made a charge against her of a balance.

The original bill was filed in this case by Ludlow, as administrator of said James Brown, a creditor, whose claim had been allowed in 1866, against Elizabeth J. Flournoy and others, who had purchased the lands from her, as above set forth, and was for the benefit of complainants and all other creditors that might come in to seek its benefits.

Setting forth the facts substantially as above stated, the bill charges that said Elizabeth was never duly appointed executrix, because she had failed to give bond and make affidavit, as well as because the will was not at first duly probated; but that she had, nevertheless, seized the assets of the estate, and recklessly wasted and squandered them; that she had neglected to obtain the proper orders of the

court in her management of the property, and had acted without any letters testamentary actually issued. It charges that she fraudulently procured the assignment of dower to be made to herself, being already provided for by will; and fraudulently sold the real estate for $4,000, a grossly inadequate sum, afterwards repurchasing the same lands at an advanced price. There are many other charges of fraud against the executrix, touching her management of the estate and her settlements, which it is not important to recapitulate. They amount to this, in effect, that out of the large amount of property received by her, and money which came to her hands from rents and sales of said property, only a very insignificant portion was applied to the debts of the estate; but that the assets were wasted, lost by neglect, squandered, or misappropriated in favor of her relatives and connexions, or by the payment of extravagant expenses, not chargeable on the estate; and that her accounts were fraudulently procured to be passed by the probate court.

The bill further charges, with regard to the several sales of real estate above set forth, that they were made without sufficient authority, and with a corrupt and fraudulent design, to hinder, delay and defraud creditors, and that they were made without notice to creditors; also, that the purchasers were aware that said executrix intended to misappropriate and misapply the assets, without paying the debts, and made the purchasers to aid her therein; that the pretended prices were inadequate, and had not been fully paid.

The prayers of the original bill are: That the probate of the will be declared void; that the deeds made by the said Elizabeth, as executrix, be annulled; that the probated claims be declared a lien upon the lands so conveyed; that an ac-

Ludlow, Ad., etc., vs. Flournoy et al.

count of rents and profits be taken against the purchasers from the time of their possession; that a receiver be appointed to collect them, and take possession of the lands, and that the same be sold, if necessary. As against the executrix, the prayer is: That her settlement be corrected and purged of illegal charges and credits; and that she be held liable for the correct balance which may be found against her. There is also the common prayer for general relief.

On the sixth of June, 1873, complainant filed an amended bill, stating that the letters of defendant, Elizabeth Flournoy, had been revoked at the June term, 1871, of the probate court, and that the sheriff had been ordered to take charge of the estate. From this order, an appeal had been taken to this court, which was afterwards dismissed; that the sheriff had never acted in the matter, and that the complainant, pending this suit, on the fourth day of June, 1873, had been duly appointed administrator *de bonis non* of said estate. He exhibits his letters of that date, and files the amended bill in that character, as well as in his former character of creditor, in behalf of himself and others.

In this amended bill, he prays specially that all the acts of the probate court touching the subject-matter before the re-establishment of the relations between Arkansas and the federal government be declared void, and that the pretended settlements of Mrs. Flournoy be held for naught, with a reiteration of the former prayer against the purchasers, and the general prayer for relief.

Answers were filed by Mrs. Flournoy (who attempts to justify her acts as executrix, on account of the losses and confusion of the war, and the difficulty of procuring orders of the court), and by the defendants, who were purchasers. The purport of all their answers, the details of which would

incumber the record, is, that all parties acted in good faith, without any intention of fraud, relying upon the authority conferred upon the executrix by the will. The purchasers claim to be innocent, and say that they paid valuable and adequate consideration. They deny any collusion with Mrs. Flournoy in any fraudulent design.

Depositions were taken on both sides, and the cause was heard upon the pleadings, exhibits and proof.

The chancellor held, upon the whole case, that the complainant was not entitled to any relief in the premises, and dismissed the cause.

Complainant appealed.

Since the bill in this case was filed, it has been repeatedly held by this court, that all the acts of the courts of the state, during the war, done in the ordinary administration of justice, and not adverse to the constitution and laws of the United States, were valid. At the time the will of Thompson B. Flournoy was probated the probate court had full jurisdiction of the matter. If it granted the probate on insufficient evidence, it was only error. It might have been corrected by making an issue of *devisavit vel non* as prescribed by the statute. It is not shown that any fraud was perpetrated upon the court or parties interested in procuring the probate; and the proceedings and orders of the court must stand. They can not be in any manner collaterally attacked, nor even directly in chancery, except for fraud; or, perhaps, some other peculiar ground of chancery jurisdiction. Nothing of the sort is shown. Mrs. Flournoy was afterwards recognized by the court, and the creditors of the estate, in many ways, and upon several occasions as executrix. The latter have no standing in court, except on the allowances of their claims against the estate under her administration. The original

grant to her of the letters was positive and unconditional. Her authority relates to the grant, and not to the mechanical issuance of the letters to her, as proof of her authority. She might take them out at any time. The subsequent renewals of the probate were from superabundant caution. They were meant to cure and not to limit or revoke any previous authority. The original bill itself recognizes her as executrix, in seeking to correct and purge her accounts. If she had not been such, the creditors would have had no ground for relief against her, at all, in equity. She would be merely a trespasser, liable to an action at law.

Considering her as executrix, the original complaint was not demurrable. The charges of fraud were sufficiently specific, and the creditors had the right to ask the court to correct, restate her settlements, and to set aside sales fraudulently made, in order that the assets might be brought back, and the administration proceed properly.

The amended bill altered the aspect of the case. The complainant assumes a new character, that of administrator *de bonis non.* As such he might, indeed, ask the court to remove clouds from the title of lands belonging to the estate, in order that he might take and administer them, by sale and application of the proceeds to the debts; but, as such, he would have no right, without joining heirs or devisees to proceed against the former executrix for a *devastavit.* His duty is only to administer the estate which comes into his hands, and to collect outstanding choses in action. For waste or loss, the former administrator or executrix is liable to the creditors, heirs or devisees—not to the administrator *de bonis non.* The latter can only collect in and administer "goods not administered."

The amended bill, however, although it could not in all things consist with the original, being in its nature multi-

farious, was nevertheless good against the purchasers of the lands. For, if they purchased in fraud of creditors, or from one not having authority to sell, then, a creditor might, in behalf of himself and other creditors, join with the administrator *de bonis non*, to remove clouds from the title of lands belonging to the estate—although they could not, without the heirs or devisees, join in a proceeding to hold the former executrix liable for a *devastavit*. The complainant, in his amended bill, seems to concede this, as he declines to pray any relief against Mrs. Flournoy, individually, but only that her settlements be held for naught. He limits his claim to setting aside the land sales. The attorneys, in argument here, concede that to have been the sole object of the suit, and it so appears from the records.

All questions concerning the liability of Mrs. Flournoy to restate her accounts, and pay balances, pass out of the case. If she has committed frauds, it is still important to establish the collusion of the other defendants therein, when they purchased the lands, but not otherwise.

The powers of an executrix are derived from the will. The probate of the will and the grant of letters testamentary are useful, if not essential, to establish the will and designate the person authorized to execute it. The inventory and the settlements are necessary, that the probate court may see that the will is executed according to its terms. But to the will itself we must look, first, to see if powers of sale are conferred. If so, they may be executed. If not, then, as the law stood when this will was probated, the probate court might, on a proper showing of the necessity, order a sale for the payment of debts. *Gould's Dig.*, chap. 4, secs. *165*, *166*, *167*.

In *James et al. v. Williams et al.*, *31 Ark.*, p. *175*, the court said : "Probating a will is but the perpetuating the

evidence of a fact by the judgment of a court. The same evidence which is required to establish the validity of the will in court, may, before a competent tribunal, be introduced to establish its validity elsewhere;" referring for authority to the case of *Campbell v. Garvin, 5 Ark., 491.* We are asked to review this decision under section 5781 of Gantt's Digest, which was part of the Civil Code.

It provides that " no will shall be received in evidence until it has been allowed and admitted to record by a *circuit* (in the original, probate) court; and its probate before such court shall be conclusive until the same is superseded, reversed or amended."

This is a new rule of evidence, having no application to the matter before us, as this will was probated in 1862, and the order admitting it has never been superseded, reversed or amended. So far as the case of *James v. Williams,* which it may be remarked arose under the old law, may go to sustain the doctrine that, the will being proven, the powers of the executor are derived from it—it is but the reiteration of a well-recognized principle. The power to sell lands, not only for the payment of debts, but for other purposes, is broadly given by the will, and might be exercised without the order of any court.

And in a case like this, the receipt of the executrix, in the absence of fraud, is a good discharge to the purchaser. He is not bound to look to the application of the purchase money. The distinction in the English equity system is, that where lands are committed to an executor or trustee, for sale, to pay specific debts, the purchaser must see to the application of the money and obtain the discharge also, of the beneficiary; otherwise he may be held liable to a second payment if the trustee should waste the funds. But if the land be charged with the payment of

debts generally, or devised for some specific purpose after payment of debts, it will not be presumed that the testator intends to impose on the purchaser the burden of finding out the creditors to get their receipts, or of taking an account of the debts and payments to see if the necessity has arisen for the sale, but it will rather be presumed that it was intended that the executor or trustee's sole receipt should be a good discharge. The question does not often arise under our system of administration. Sales are generally made under orders of court, and the money paid to its officer or commissioner, or some one authorized to receive it; which discharges the purchaser, of course, on confirmation. Or where lands are devised or conveyed on special trusts, it is usual with careful conveyances to insert a clause making the trustee's receipt a full discharge. The cases are very few indeed, in American practice, where a power of sale is given in such a manner as to require the purchaser to look to the application of the purchase money. The risks attending such sales would greatly discourage purchasers, and the rule requiring purchasers to see to the application of the money has been rather relaxed than favored by the American authorities. It never did extend to personalty, and at no time would it have applied to realty under a will like the one in question. See the leading case of *Elliott v. Merryman, 1 White & Tudor's Lead. Ca. in Equity, p. 59.*

The exceptions to the rule are laid down by Lord Thurlow, as follows: "If one concerts with an executor by obtaining the testator's effects at a nominal price, or at a fraudulent undervalue, or by applying the real value to the purchase of other objects for his own behoof, or in extinguishing the private debt of the executor, or in any other manner contrary to the duty of the office of execu-

tor, such concert will involve the seeming purchaser, or his pawnee, and make him liable for the full value " *Scott v. Taylor, 2 Dick.;* quoted also in notes to *Elliott v. Merryman, supra.*

If, as charged in the bill, the defendant purchasers, or any of them, have been guilty of such concert with Mrs. Flournoy, as is above indicated, then under the prayer for general relief, the court might require them to pay full value for their purchases into the hands of the administrator *de bonis non*, or make such other decree as would insure the application of the full value to the legitimate purposes of the estate, so far as any part of it may not already have been so applied, and might hold the lands bound to a trust for the purpose. This was the real question at issue, which became one of fact for the chancellor.

Certainly the administration of Mrs. Flournoy led to results which in ordinary times, under ordinary circumstances, would seem shocking. A vast estate of near half a million of dollars seems to have melted away like the snows, leaving unpaid the greater portion of a list of debts, which did not amount altogether, perhaps, to more than one-fifth in value, of the estate. Many things were done by her loosely, irregularly, illegally. Extravagant charges seem to have been made by way of credits, and there were many other things which, on their face, bear the impress of such management as this court has in former cases held to be constructive fraud, justifying the interference of a court of chancery. Had the bill been prosecuted against Mrs. Flournoy as begun, there is little doubt that the chancellor would have corrected her settlements and held her to a stricter liability. But this court can not ignore the public history of the times, the pen-

30

dency of a destructive war, which was flagrant from the time of her appointment, in 1862, until the spring of 1865 ; the privations and distresses of the masses of population; the prostration of values and the disorganized condition of the courts.   These are matters of history and general knowledge, which a chancellor may well consider in judging of the conduct and weighing the motives of parties charged with fraud.   There may be constructive fraud compatible with the most honest and honorable intentions.   This is important when others are charged with concert.

The evidence shows the loss of $125,000 at one fell swoop by the emancipation proclamation ; and the probate court accepted the report of the loss of large amounts of cotton by burning.   Stricter proof should have been required.   But the report was probable, and not on its face fraudulent. Large amounts were expended, and perhaps wasted, on levee works ; and large amounts expended in expenses of the family.   The evidence tends to show that Mrs. Flournoy managed throughout with honest intentions to pay the debts, and there is no reason to believe that any one doubted her sincerity.   It is the creditors alone who complain. The devisees are satisfied to submit to their losses.   There is no proof of any actual design to defeat creditors by the sale of land brought to the notice of the purchasers ; nor does it seem to be sufficient even to arouse their suspicions. The sale of the land for $4,000, and the repurchase for $5,000, is explained in such a manner as to rebut fraudulent intent.   And as to the matter of dower, it produced no harm to complainants, as far as the court can ascertain from the papers.   The same lands assigned to her for dower were embraced in the deeds to purchasers.   It amounted to a. relinquishment of her rights to the purposes of the will;

Ludlow, Ad., etc., vs. Flournoy et al.

and the purchasers might look to the will alone for her authority to sell.

The evidence does not show that the lands were sold at inadequate values. It conduces to prove, taken as a whole, that the purchasers paid the actual values, if not precisely the sums mentioned in their deeds. At least, it can not be said they were so inadequate as to raise the presumption of fraud.

There remains another consideration which may have properly had weight with the chancellor. The complainant in this case, the sole original mover of the litigation, excepted in 1870 to the second settlement of the executrix, and did not then object to these sales, although they were reported in the settlement. It was an acquiescence for more than a year before the commencement of his suit, during which the purchasers may have gone on making improvements. It is not at all a conclusive circumstance against his equity; nor is there any question of limitation. But acquiescence for any considerable time is often an element against relief. It was so considered in the leading case of *Elliott v. Merryman*, although in that case the time of delay was much longer than in this. The principle is recognized in the English cases, that length of time and acqiescence will prevent creditors from questioning sales by executors; even when the sales were attended with suspicious circumstances of fraud. See *Bonney v. Redyard, cited on p. 138 of Bro. C. C., Vol. 4, and ib., note 5, on p. 130.*

The time alone in this case is not sufficient for the imputation of *laches;* but taken in connection with the strong inference, from the evidence, that the principal complainant knew of the sales when made, and the fact that he did appear and object to the confirmation of the second report

of the executrix, without objecting to the sales therein reported, the subsequent delay of more than a year to file this bill is certainly persuasive of acquiescence at the time. The complainant is shown to have been in a situation favorable to the discovery of fraud if any had been intended.

At the hearing, the chancellor rejected, as evidence, a deposition of L. T. Blackburne, made in another case, between other parties, to the effect that he had paid for the land conveyed to him at the rates of $25 per acre. This would make the consideration some $3,500 more than that expressed in the deed. The inference meant to be derived from this was, doubtless, that the excess had been paid as a bonus to the executrix, and not accounted for in her report; thus raising a presumption of fraud. The rejection of this evidence is complained of as error. The parties being different, this evidence was only admissible, if at all, as an admission. L. T. Blackburne was only a nominal defendant in this case. He held the dry legal title for the sale and separate use of his wife, who was the real defendant. The admission was historical, and not offered as a part of the *res gestæ* attending the conveyance. He could not thus prejudice the rights of his *cestui que trust*, the real owner ; nor could his admission be used against her. Besides, the same facts appear in the testimony of another witness, and if entitled to consideration, were before the chancellor.

We do not think fraud was shown on the part of any of the purchasers, and upon the whole case, are of opinion that the chancellor did right in dismissing the bill after it had ceased to be pressed against Mrs. Flournoy.

Affirm the decree.